UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JENNA PATTBERG,<br><br>      Plaintiff,<br><br>v.<br><br>LELE SADOUGHI DESIGNS LLC, LISA SADOUGHI, and ARMAND SADOUGHI,<br><br>      Defendants. | Case No.  24 Civ. 3252<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jenna Pattberg, by and through her attorneys at Filosa Graff LLP, as and for her Complaint in this action against Defendant Lele Sadoughi Designs LLC ("Lele Sadoughi" or the "Company"), Lisa Sadoughi, and Armand Sadoughi (collectively, "Defendants") alleges upon personal knowledge and upon information and belief as to other matters as follows:

## PRELIMINARY STATEMENT

1. This is an action seeking declaratory, injunctive, and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices against Plaintiff, including Defendants' discrimination and retaliation against Plaintiff in violation of the New York State Human Rights Law ("State Human Rights Law"), N.Y. Exec. Law §§ 290 *et seq.*, and New York City Human Rights Law ("City Human Rights Law"), New York Administrative Code §§ 8-101 *et seq.*

2. Specifically, Defendants violated the State Human Rights Law and City Human Rights Law by terminating Plaintiff's employment because of her disability, her use of time away from work because of her disability, and/or her protected complaints of discrimination or retaliation in violation of these laws.

1

3. Defendants' unlawful conduct was knowing, malicious, willful and wanton and/or showed a reckless disregard for Plaintiff's protected rights, which has caused and continues to cause Plaintiff to suffer substantial economic and non-economic damages, and severe mental anguish and emotional distress.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is diversity of citizenship between Plaintiff, a citizen of the State of New Jersey, and Defendants, citizens of New York and Texas, and this action involves a matter in controversy that exceeds the sum or value of $75,000, exclusive of interest and costs.

5. Venue is proper in the district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this district.

## PARTIES

6. Plaintiff Jenna Pattberg is a former employee of Lele Sadoughi and is a citizen of the State of New Jersey. At all relevant times, Plaintiff met the definition of "employee" under all applicable statutes.

7. Defendant Lele Sadoughi Designs LLC is a domestic limited liability company with its principal place of business at 520 West 27th Street, Suite 801, New York, NY 10001. Upon information and belief, Lisa Sadoughi and/or Armand Sadoughi are the only members of Lele Sadoughi Designs and both are citizens of the State of Texas. At all relevant times, the Company met the definition of "employer" under all applicable statutes.

8. Defendant Lisa Sadoughi is the owner and operator of Lele Sadoughi Designs, LLC and is a citizen of the State of Texas. Upon information and belief, Lisa Sadoughi and/or Armand Sadoughi are the sole members of the Lele Sadoughi Designs, LLC.

9. Defendant Armand Sadoughi is the CFO and de fact human resources manager for Lele Sadoughi Designs, LLC and is a citizen of the State of Texas. Upon information and belief, Lisa Sadoughi and/or Armand Sadoughi are the sole members of the Lele Sadoughi Designs, LLC.

## ADMINISTRATIVE REQUIREMENTS

10. Contemporaneous with the filing of this Complaint, Plaintiff is filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*. ("ADA"). Plaintiff's EEOC charge arises out of many of the same facts alleged herein.

11. When the EEOC completes its investigation of the charge and issues Plaintiff a notice of right to sue, Plaintiff will seek leave to amend this Complaint to add claims against the Company arising out of Defendants' violation of the ADA.

12. Contemporaneous with the commencement of this action, a copy of this Complaint was served on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of §8-502 of the New York City Administrative Code.

13. Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

14. Plaintiff is a former employee of the Company.

15. Plaintiff was hired as the Company's Vice President, Operations, Logistics, and Planning in January 2020.

16. In this position, Plaintiff was responsible for growing the Company's business through planning, operations, logistics and managed the Company's financial operations, with some additional responsibility for sales.

17. Immediately upon her hiring, Plaintiff sought to professionalize and modernize the operations of the Company. To that end, Plaintiff developed and implemented operations procedures for the entire organization and trained employees on these procedures; developed sales, reporting and forecasting tools; and implemented performance reviews and weekly touch bases for ongoing training and development of staff.

18. As a result of Plaintiff's efforts, the Company had its most successful year in 2020, despite the challenges presented by the COVID-19 pandemic.

19. In January 2022, in recognition of her high level of performance and dedication to the Company, Defendants promoted Plaintiff to the position of Senior Vice President, DTC and Wholesale. With this promotion came the additional responsibility of direct supervision of the Company's wholesale sales team.

**Plaintiff's Disability and Need for Accommodation**

20. In May 2020, Plaintiff was hospitalized with severe stomach pain and was ultimately diagnosed with Crohn's Disease, an inflammatory bowel disease that affects the digestive system and can cause debilitating symptoms when it flares up.

21. Because flare ups are often caused by the immune system attacking healthy tissue in the gastrointestinal tract, treatment for this disease usually includes taking immune suppressants, which makes her more susceptible to any number of illnesses. As a result, Plaintiff often required accommodations – such as remote work and additional time off – when she was suffering from a flare up, had medical appointments, or was otherwise sick.

22. After notifying Defendants of her diagnosis, Lisa Sadoughi was generally hostile to any accommodation that Plaintiff had requested. For example:

    a. In September 2020, when Mrs. Sadoughi returned to New York after spending most of 2020 in Hilton Head, South Carolina and Dallas, Texas, she demanded that everyone return to work in the office, despite the fact that COVID-19 vaccines were not yet available and, as someone with a compromised immune system, Plaintiff was at serious risk if she contracted COVID-19. As a result, Plaintiff continued working remotely until June 2021, when all employees were fully vaccinated against COVID-19. However, Mrs. Sadoughi routinely criticized Plaintiff and other employees that worked remotely during this time and noted Plaintiff's "lack of presence in the office" during her January 2022 performance review.

    b. In her January 2023 performance review, Mrs. Sadoughi characterized Plaintiff's attendance as "poor" because she was not working in the office enough – despite working the agreed-upon two days per week in the office in 2022 (and then three days per week in 2023). Mrs. Sadoughi's criticism ignores the fact that Plaintiff worked from the office as much as necessary – often four days per week during the peak season – but would need to work remotely when necessary to accommodate her medical condition.

    c. In June 2023, Plaintiff took a sick day because of a Crohn's flare-up and requested to work from home the following day. Despite having available work-from-home days, Mrs. Sadoughi denied Plaintiff's request and told Plaintiff that she was using her PTO "recklessly" and would not have any sick days for the remainder of the year. When Plaintiff mentioned that she may need to take a short-term disability leave, Mrs. Sadoughi responded incredulously, "For what? Crohn's?!" At one point during this call, Mrs. Sadoughi told Plaintiff, "Let's be honest, I hate you and you hate me." The fact that Mrs. Sadoughi apparently "hated"

Plaintiff because she had simply asked for a work-from-home day as an accommodation for her disability only serves to confirm that Mrs. Sadoughi did not like the fact that Plaintiff required accommodations for her disability and that viewed any accommodations as a burden on the Company.

23. Despite dealing with a serious medical condition in the middle of a global pandemic, Plaintiff was dedicated to her employment with the Company, routinely working long hours and doing whatever was required to ensure that the Company was successful.

24. As noted above, the Company had its most successful and profitable year during Plaintiff's first year of employment – when everyone was working fully remote because of the COVID-19 pandemic.

25. All of this is a testament to Plaintiff's leadership and performance while working for the Company. In stark contrast, when employees returned to working in the office in June 2021, they were forced to work in unsanitary conditions that literally made employees sick. This was repeatedly raised with Mrs. Sadoughi, but she failed to do anything about it until June 2023 after a city-wide air quality alert.

26. As the senior-most employee in the New York office, Plaintiff had to deal with these issues because Mrs. Sadoughi failed to do so, in part because she had moved to Texas and primarily worked remotely.

**Plaintiff's Leave of Absence**

27. In early August, Plaintiff met with her doctors to review the results of a recent procedure; at this appointment, Plaintiff's doctor advised her of several concerns with this recent procedure and recommended that she take a leave of absence from work to focus on reducing stress so her Crohn's would go into remission.

28. Shortly thereafter, Plaintiff had a regularly scheduled appointment with a mental health provider, who also recommended that she take a medical leave of absence from her job with the Company to treat her mental health.

29. On August 13, 2023, Plaintiff emailed Lisa Sadoughi and Armand Sadoughi – Mr. Sadoughi served as the Company's CFO and head of human resources – to request a medical leave of absence from August 16, 2023 through November 2, 2023.

30. While Mrs. Sadoughi begrudgingly granted this accommodation, it is clear from her conversations with others that she took a negative view of Plaintiff's medical leave of absence. For example:

   a. Mrs. Sadoughi met with staff in the days after Plaintiff's leave of absence to ask them how they felt about Plaintiff "leaving the company" – it is clear that Mrs. Sadoughi doubted whether Plaintiff would return from her leave of absence and improperly communicated that to Plaintiff's co-workers.

   b. Mrs. Sadoughi repeatedly characterized Plaintiff's leave of absence as "abrupt," as if Plaintiff had planned to have her Crohn's flare-up to the point that she was unable to work.

   c. After the VP of Global Sales resigned on August 17, 2023, Mrs. Sadoughi told another employee that this employee and Plaintiff had "planned to leave at the same time to screw [Mrs. Sadoughi] over." First, this employee's resignation was not the result of Plaintiff's medical leave but because of Mrs. Sadoughi's treatment of her and making her choose between her family and her employment with the Company. Second, Plaintiff invested a great deal of time and effort to transition her job responsibilities while she would be out on leave; thus, she made every effort to alleviate any impact that her leave would have on the Company. The fact

that Mrs. Sadoughi would describe an employee's legitimate need for medical leave as an effort to "screw [her] over" evinces a complete lack of regard for Plaintiff's well-being.

31. On October 25, 2023, while Plaintiff was still on leave, Mrs. Sadoughi reached out to confirm her return from her leave and scheduled a call for the October 30, 2023. During this call, Plaintiff advised Mrs. Sadoughi and Mr. Sadoughi that she had contracted COVID-19 and was still suffering symptoms and, as a result, was unable to schedule appointments with her doctors, but would do so as soon as possible and follow up with them about her return to work.

32. Defendants then extended Plaintiff's leave of absence to November 20, 2023.

33. Plaintiff then met with her doctor on November 9, 2023, and he recommended that Plaintiff extend her medical leave to January 8, 2023.

34. Plaintiff notified Mr. Sadoughi and Mrs. Sadoughi the following day (November 10, 2023) to request an extension of her leave of absence to January 8, 2023. Defendants took did not respond until November 15, 2023, when they scheduled a call for the following day.

35. During the call, which was only with Mr. Sadoughi, he expressed frustration with Plaintiff's request for an extension and told her that he did not "know what to do with this information" and did not know what Defendants would do in response to her request.

36. Later that day, Mr. Sadoughi emailed Plaintiff to notify her that the Company would not approve her request for an extension of her leave of absence because it was an "undue hardship" for the Company.

37. Mr. Sadoughi then advised Plaintiff that he and Mrs. Sadoughi were "continuing to think about next steps" and "we can discuss at the end of the month," which left Plaintiff in limbo regarding the status of her employment with the Company.

8

38. Hearing nothing from Defendants about these "next steps," Plaintiff continued her efforts to improve her health so that she could return to work in January.

39. In a December 1, 2023 telephone conversation with Mr. Sadoughi, he seemed upset with Plaintiff and repeatedly questioned her about her "motivation" and why she wanted to return to work.

40. Mr. Sadoughi told Plaintiff that her "return [to work] was never a guarantee" and that she had been out on leave "way too long," that her leave had been "really hard on the business." It was during this call that Mr. Sadoughi told Plaintiff that Defendants could not "afford to wait until January" for Plaintiff to return to work.

41. When Plaintiff insisted on returning to work for the Company, Mr. Sadoughi then shifted gears and expressed concern over "issues" that he believed existed between Plaintiff and Mrs. Sadoughi. Specifically, Mr. Sadoughi told Plaintiff that he was concerned about her working with Mrs. Sadoughi because of these perceived "issues," telling her, "There were so many issues in the past. I don't know why you would want to come back."

42. Presumably, these "issues" related to the hatred that Mrs. Sadoughi felt for Plaintiff because of her prior use of sick time or requests to work remotely and Mrs. Sadoughi's feeling that Plaintiff had tried to "screw [her] over" by going out on a medical leave of absence.

43. Mr. Sadoughi also repeatedly referenced the turnover that had occurred after Plaintiff went out on a leave of absence commenced – a clear attempt to blame Plaintiff for taking a medical leave of absence.

44. The call ended with Mr. Sadoughi saying that he needed to speak with Mrs. Sadoughi about Plaintiff's status with the Company.

45. This conversation was extremely troubling to Plaintiff who had been working hard so that she could return to work.

46. On December 4, 2023, Armand Sadoughi called Plaintiff to notify her that the Company was terminating her employment because her request for an extension of her leave of absence was "not a reasonable accommodation" and was an "undue hardship" for the Company.

47. To support this contention, Mr. Sadoughi claimed that it had gotten more expensive for the Company to continue Plaintiff's leave. When Plaintiff questioned this because the Company was not paying her salary while she was out on leave and had not hired anyone to replace her, Mr. Sadoughi tried to claim that the Company had to hire additional employees to replace others that left and "pay them more money" to handle some of Plaintiff's responsibilities and also mentioned that the Company had to hire an HR attorney as result of Plaintiff's medical leave and exercise of her rights under the ADA.

48. Plaintiff disputes that Defendants had to pay new employees more to handle some of Plaintiff's job responsibilities because Plaintiff knows that her job responsibilities had been primarily handled by existing Company employees and that Defendants had not paid these employees any additional compensation to handle Plaintiff's job responsibilities.

49. Plaintiff also disputes Defendants' contention that her leave of absence imposed an undue hardship on the Company; instead, Plaintiff believes that Defendants denied her request for an extension of her medical leave, in part, to retaliate against Plaintiff having taken a medical leave in the first place.

50. In early December 2023, Plaintiff retained the undersigned counsel, who sent a letter to Mrs. Sadoughi outlining Plaintiff's concerns that Defendants had violated the ADA, State Human Rights Law, and City Human Rights Law by terminating Plaintiff's employment.

51. Despite these concerns, Defendants refused to reconsider their decision to terminate Plaintiff's employment with the Company.

52. On January 4, 2024, Plaintiff met with her doctor and he cleared Plaintiff to return to work on January 8, 2024.

53. The following day, January 5, 2024, Plaintiff's counsel notified Mr. Sadoughi that Plaintiff was cleared to return to work and that Plaintiff was able to return to work if the position had not been filled.

54. To date, Defendants have refused to reinstate Plaintiff to her former position with the Company.

## FIRST CAUSE OF ACTION
### (Violation of State Human Rights Law)
### (Against all Defendants)

55. Plaintiff hereby repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

56. At all relevant times, Plaintiff was an "employee" within the meaning of the State Human Rights Law.

57. At all relevant times, the Company met the definition of an "employer" within the meaning of the State Human Rights Law.

58. Defendants engaged in discrimination and retaliation in violation of the State Human Rights Law by, among other things, (i) denying Plaintiff a reasonable accommodation for her disability in the form of an extension of Plaintiff's leave of absence through January 8, 2024; (ii) retaliating against Plaintiff by terminating her employment because she took a medical leave of absence and/or requested an extension of this medical leave of absence; and/or (ii) retaliating against Plaintiff by refusing to reinstate her to her former position after her doctor

cleared her to return to work because Plaintiff had taken a medical leave of absence and/or raised concerns about Defendants' termination of her employment because she requested an extension of her medical leave of absence.

59. Armand Sadoughi and Lisa Sadoughi are individually liable for Defendants' violations of the State Human Rights Law either because they meet the definition of an "employer" under the State Human Rights Law or because they aided and/or abetted the Company's violation of the State Human Rights Law by actively participating in the above-outlined conduct, which violates the State Human Rights Law.

60. As a direct and proximate result of the Defendants' unlawful conduct in violation of the State Human Rights Law, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which Plaintiff is entitled to an award of damages.

61. As a direct and proximate result of the Defendants' unlawful conduct in violation of the State Human Rights Plaintiff has suffered and continues to suffer from mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages.

62. Defendant's unlawful retaliatory conduct constitutes malicious, willful and wanton violations of the State Human Rights Law for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Violation of the City Human Rights Law)
### (Against All Defendants)

63.     Plaintiff hereby repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

64.     At all relevant times, Plaintiff was an "employee" within the meaning of the City Human Rights Law.

65.     At all relevant times, the Company met the definition of an "employer" within the meaning of the City Human Rights Law.

66.     Defendants engaged in discrimination and retaliation in violation of the City Human Rights Law by, among other things, (i) denying Plaintiff a reasonable accommodation for her disability in the form of an extension of Plaintiff's leave of absence through January 8, 2024; (ii) retaliating against Plaintiff by terminating her employment because she took a medical leave of absence and/or requested an extension of this medical leave of absence; and/or (ii) retaliating against Plaintiff by refusing to reinstate her to her former position after her doctor cleared her to return to work because Plaintiff had taken a medical leave of absence and/or raised concerns about Defendants' termination of her employment because she requested an extension of her medical leave of absence.

67.     Armand Sadoughi and Lisa Sadoughi are individually liable for Defendants' violations of the City Human Rights Law either because they meet the definition of an "employer" under the City Human Rights Law or because they aided and/or abetted the Company's violation of the City Human Rights Law by actively participating in the above-outlined conduct, which violates the City Human Rights Law.

68. As a direct and proximate result of the Defendants' unlawful conduct in violation of the City Human Rights Law, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which Plaintiff is entitled to an award of damages.

69. As a direct and proximate result of the Defendants' unlawful conduct in violation of the City Human Rights Plaintiff has suffered and continues to suffer from mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages.

70. Defendant's unlawful retaliatory conduct constitutes malicious, willful and wanton violations of the City Human Rights Law for which Plaintiff is entitled to an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State of New York and the City of New York;

B. An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C. An order directing Defendants to place Plaintiff in the position she would have occupied but for Defendants' discriminatory, retaliatory and/or otherwise unlawful treatment of her, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to

affect Plaintiff;

  D. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

  E. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

  F. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

  G. An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

  H. An award of punitive damages;

  I. An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

  J. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: April 29, 2024

        FILOSA GRAFF LLP

By: _____
        Gregory N. Filosa (GF-5680)

        17 State Street, 40th Floor
        New York, NY  10003
        Tel:  (212) 256-1780
        Fax: (212) 156-1781
        gfilosa@filosagraff.com

        COUNSEL FOR PLAINTIFF